# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Carl Lee Eller, et al., *individually and on*                    Civil No. 11-2623 (SRN/JJG)
*behalf of all others similarly situated*,

                   Plaintiffs,

     v.                                                                                    **ORDER**

National Football League Players
Association, et al.,

                   Defendants.

---

Michael D. Hausfeld, and Hilary K. Scherrer, Hausfeld LLP, 1700 K Street, NW, Suite 650, Washington, D.C. 20006; Michael P. Lehmann, Jon T. King, and Arthur N. Bailey, Hausfeld LLP, 44 Montgomery St., San Francisco, CA 94111; Mark Feinberg, Michael E. Jacobs, and Shawn D. Stuckey, Zelle Hofmann Voelbel & Mason, LLP, 500 Washington Ave. South, Suite 4000, Minneapolis, MN 55415; Daniel S. Mason, Zelle Hofmann Voelbel & Mason, LLP, 44 Montgomery St., Suite 3400, San Francisco, CA 94104, for Plaintiffs.

Jeffrey L. Kessler, and David L. Greenspan, Dewey & LeBoeuf LLP, 1301 Avenue of the Americas, New York, NY 10019; James W. Quinn, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153; Barbara Podlucky Berens, and Justi Rae Miller, Berens & Miller, P.A., 3720 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for Defendants.

---

SUSAN RICHARD NELSON, United States District Judge

       This matter is before the Court in this consolidated action on the motions to

dismiss brought by Defendants National Football League Players Association

("NFLPA"), its Executive Director, DeMaurice Smith, and two individual football

players, Tom Brady and Mike Vrabel (Doc. Nos. 23 and 41).  For the reasons stated

below, this Court grants the motions.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

A.      **The *Brady* and *Eller I* Actions**

In May 2008, the National Football League announced it would opt out of the then-existing CBA with the NFLPA effective March 11, 2011, two years before the scheduled expiration of its term.  In February 2011, the League then filed an unfair labor practice charge with the NLRB, alleging that the NFLPA's threat to decertify itself as a union constituted an unfair labor practice.  The parties attempted to resolve their dispute in mediation before George Cohen of the Federal Mediation and Conciliation Service.  Plaintiffs allege that the League's last proposal to the players included benefits for the retired players worth $1.5 billion over the ten-year span of a new CBA.  (Doc. No. 1, ¶ 87.)[1]

On March 11, 2011, the NFLPA renounced its status as the collective bargaining agent for the players and took related actions to decertify itself as a union.  (Id. ¶ 82.)  In response, the League instituted a "lockout" of the players.  That same day, Brady and several other active or prospective players (the "*Brady* plaintiffs") sued the League and its thirty-two constituent teams, alleging that the "lockout" violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 ("the *Brady* action").  (Id. ¶ 92.)  They "did not seek to represent a class of former NFL players."  (Id.)

On March 28, 2001, several retired professional football players including Plaintiff

---

[1]      Unless otherwise noted, all citations to the record are to the present action, No. 11-CV-2623.  All documents filed in the *Eller I* action, No. 11-CV-748, after April 11, 2011, the date it was consolidated with the *Brady* action, No. 11-CV-639, are referenced as filed in No. 11-CV-639.

Carl Eller (the "*Eller I* plaintiffs") filed a complaint on behalf of a putative class of retired

players against the same defendants named by the active players ("the *Eller I* action").

(Doc. No. 1, ¶ 94.)  And also like the active players, the *Eller I* plaintiffs alleged that the

League violated Section 1 of the Sherman Act.  (No. 11-CV-748, Doc. No. 1.)[2]  This

Court consolidated the two actions.  (No. 11-CV-748, Doc. No. 49.)  "Counsel for the

*Brady* Defendants repeatedly disclaimed any intent to represent the class of retired

players defined in the *Eller I* complaint."  (Doc. No. 1, ¶ 95.)[3]

On April 11, 2011, this Court ordered mediation of both of the disputes before

Chief Magistrate Judge Arthur Boylan.  (No. 11-CV-639, Doc. No. 56.)  The Order

recognized that the mediation sessions could be either "joint or separate."  (Id. at 2.)  The

Order also provided that "all confidential dispute resolution communications shall remain

confidential," and that "the fact of participation in this Court-ordered mediation, and any

communications conveyed between the parties in this process, shall not be admitted or

used against any party in any other proceeding or forum, for any purpose."  (Id. at 3.)

At mediation proceedings in April and May of 2011, "counsel for the *Eller I*

plaintiffs alone were acknowledged to represent the interests of retired NFL players."

_____

[2]        In addition, they sought declaratory relief that the League waived any right
to rely on any labor exemption to antitrust liability based on an argument that the players
union's decertification was a sham or otherwise ineffective.  (Id.)

[3]        Plaintiffs define "the Brady Defendants" as Defendants Brady and Vrabel
collectively.   (Doc. No. 1, ¶ 34.)  Brady and Vrabel were, of course, two of the ten
plaintiffs in the *Brady* action.  In the present action, the Court notes that Plaintiffs, when
referring to "the Brady Defendants," apparently mean *all* of the plaintiffs in the *Brady*
action.

(Doc. No. 1, ¶ 97.)   Counsel for the *Brady* plaintiffs proposed to counsel for the *Eller I* plaintiffs "'that the *Brady* plaintiffs cover the economic system issues'" such as a revenue split between the League and the players, while  the *Eller I* plaintiffs "'would make the proposal on the retired player issues.'"  (Id. ¶ 98.)  Counsel for the *Eller I* plaintiffs met with Dennis Curran of the NFL and made a proposal for increased retired player benefits "that went significantly above the level proposed by the NFL at the mediation" with George Cohen in February 2011 before the NFLPA decertified.  (Id. ¶ 100.)  The *Eller I* plaintiffs made various demands such as medical monitoring of head injuries.  (Id. ¶ 101 & Ex. A.)  The League "made no substantive counteroffer."  (Id. ¶ 102.)  Counsel for the *Eller I* plaintiffs again reiterated that they alone represented the retired players and would negotiate through an organization separate from the NFLPA.  (Id. ¶¶ 103-04.)

After May 16, 2011, the League held several negotiations with "the active player *Brady* Defendants," but Plaintiffs allege that "[n]either the *Eller I* plaintiffs nor their counsel were allowed to attend these meetings."  (Id. ¶ 107.)   In fact, Plaintiffs allege that "it became clear" that those parties "were negotiating issues relating to retired NFL players."  (Id. ¶ 108.)  "No one among the *Eller I* plaintiffs authorized the NFLPA or the *Brady* Defendants to assume that role."  (Id. ¶ 109.)  Moreover, they allege that the Brady Defendants refused the request of the *Eller I* plaintiffs to participate in their negotiations. (Id. ¶ 110.)

In July 2011, counsel for the *Eller I* plaintiffs were informed that the *Brady* Defendants had decided to reconstitute themselves as a union.  (Id. ¶ 112.)  They were

also informed that the League would not negotiate retiree issues directly with the *Eller I* plaintiffs and that the League's resolution of the dispute with the *Brady* Defendants would include increased benefits for the retired players.  (Id. ¶¶ 114-16.)  "On July 19, 2011, the League had calculated that the total value of these improvements over the duration of a ten-year CBA was estimated to be $900 million–far less than the $1.5 billion on the table at the mediation overseen by Cohen, [and] far less than either of the *Eller I* plaintiffs' proposals."  (Id. ¶ 117.)

The *Eller I* plaintiffs understood these communications to mean "that an agreement had already been reached among the NFL, the NFLPA, the *Brady* Defendants and Smith on the terms of any resolution as to retired NFL players."  (Id. ¶ 118.)  The Complaint also alleges that "the plan that had been agreed to was that formal assent to these terms would occur only after the NFLPA recertified itself as a union."  (Id.)  On July 21, 2011, it was reported that the League "had approved a 'long-term agreement' with NFL players that included the terms affecting retirees."  (Id. ¶ 120.)

On July 25, 2011, the NFLPA's player representatives voted to approve the ten-year deal.  (Id. ¶ 121.)  On August 4, 2011, it was reported that the NFLPA had recertified itself as a union.  (Id. ¶ 122.)  That same day, the League and the NFLPA signed the 2011 CBA, which "released any claims that could be asserted in the SSA, the suit that led up to it, or the *Brady* action," and also stated that "'[f]or purposes of clarity, this release does not cover any claims of any retired player.'"  (Id. ¶ 123.)  The League and the *Brady* plaintiffs then stipulated to a dismissal with prejudice of the *Brady* action.

In the interim, in July 2011, the *Eller I* plaintiffs moved for leave to file a Second Amended Complaint that would name as defendants, in addition to the League, the NFLPA, all ten of the individual *Brady* plaintiffs, and Smith.  (No 11-CV-639, Doc. No. 157.)[4]  Count I, the Sherman Act Section 1 antitrust claim, was now also asserted against the new defendants as well as the League.  Count II, a new Sherman Act Section 1 antitrust claim, was asserted against the NFL Defendants.  Count III would be a claim for breach of fiduciary duty against the NFLPA.  But before the hearing on the motion to amend could be heard, the *Eller I* plaintiffs, on August 24, 2011, voluntarily dismissed their action without prejudice.  (No. 11-CV-639, Doc. Nos. 199, 200 (amended notice).)

## B.    The Present Action

In September 2011, Eller and numerous other retired players, including some that had been or sought to be plaintiffs in *Eller I*, filed the present action.[5]  Unlike *Eller I*, however, which originally was brought against only the League but which later sought to add as Defendants the NFLPA, Smith, and the active players who were plaintiffs in the *Brady* action, this action is against only the NFLPA, Smith, Brady, and one other individual player, Vrabel, who had been an active player when the *Brady* action was filed

---

[4]     The First Amended Complaint had added as a plaintiff "one prospective professional football player who seeks to enter the league as a rookie."  (No. 11-CV-748, Doc. No. 32, ¶ 1.)

[5]     Plaintiffs seek relief on behalf of a class "composed of all retired or former professional football players who were employed by any NFL member club but are not now salaried employees of the NFL or any member club or of the NFLPA and who receive or are eligible to receive" benefits from any of the NFL's benefit plans.  (Doc. No. 1, ¶ 38.)

but who has since retired.  (Doc. No. 1.)[6]  The League is no longer a Defendant.  The

putative class action Complaint asserts three claims:  (1) a claim for declaratory relief of

various forms ("Count I"), (2) a claim for intentional interference with prospective

economic advantage ("Count II"), and (3) a claim, pled in the alternative to Count I, for

breach of a fiduciary duty ("Count III").  (Id.)  Thus, among other changes, Plaintiffs

have dropped their antitrust claims.  At bottom, the present Complaint alleges that "the

NFLPA and the individual *Brady* Defendants . . . had no authority to negotiate with the

League the term of pension, retirement, and disability benefits with respect to the class of

retired NFL players."  (Id. ¶ 1.)  As Plaintiffs now explain, "[t]he NFLPA and its counsel

for the *Brady* plaintiffs . . . initially were willing to let the plaintiffs in this parallel class

action represent the interests of retired players.  Ultimately, however, they decided to

work out a compromise with the League that resolved issues as to both active *and* retired

players.  None of the plaintiffs in *Eller I* authorized or approved this conduct."  (Doc. No.

51, at 10 (emphasis in original).)

        Defendants now move to dismiss.

## II.    DISCUSSION

        Defendants seek dismissal on several grounds.  They first contend that the

Complaints are based on an improper challenge to the mediation and settlement

negotiations ordered by this Court and deemed confidential.  (Doc. No. 25, at 17.)

---

        [6]      In October 2011, other former players filed a similar putative class action.
(No. 11-CV-3012, Doc. No. 1.)  The two actions were consolidated in December 2011.
(Doc. No. 28.)  This Court will cite only to the Complaint in the present action by Eller,
as the parties identify no meaningful difference between the two.

Defendants next argue that the state-law claims are preempted by the federal LMRA.  (Id. at 20.)  Defendants also argue that the state-law fiduciary duty claim fails because Defendants owed the retired players no legal duties and that the tortious interference claim fails because the retired players had no legal right to any additional benefits and thus no prospective economic advantage with which Defendants could have interfered. (Id. at 22-29.)  Finally, Defendants contend that the declaratory judgment claim fails for various related reasons.  (Id. at 29-33.)

> In response, Plaintiffs argue that
>
> [t]he Complaints allege a scheme whereby the NFLPA:  (1) engaged in a sham decertification of itself as a Union; (2) had certain of its members (including Union executives) institute simultaneously with decertification an antitrust class action lawsuit . . . against [the League] that was subsidized and controlled by the Union in which the plaintiffs sought to represent a class of only active players; (3) worked out a settlement agreement with the League that compromised the rights of retired players; and (4) promptly recertified itself as a Union.

(Doc. No. 51, at 9.)[7]

_____

[7]    In opposition to dismissal, Plaintiffs contend that (1) the settlement violates the rule of Amchem Prods., Inc. v. Windsor that "settlement classes with inherently conflicted factions cannot be certified without separate class counsel" (Doc. No. 51, at 11); (2) the NFLPA's decertification was a sham (id. at 16); (3) the parties in Brady engaged in impermissible collective bargaining (id. at 25); (4) their settlement was not the "product of court-supervised mediation" (id. at 22-23); (5) the complete settlement agreement was reached in mid-July before the NFLPA recertified as a union (id. at 24); (6) the NFLPA "controlled the Brady litigation" (id.); (7) the Mediation Order does not shield wrongs that were committed in the course of the settlement discussions (id. at 27); and (8) their claims are not preempted by federal labor law (id. at 32-35).  This Court's conclusions as to the viability of Plaintiffs' claims simply do not turn on any of these allegations or issues.  For example, with respect to Plaintiffs' reliance on Amchem, this Court observes that it certified none of the proposed classes in either Brady or Eller I, and did not appoint a single class counsel to represent the disparate interests of the various factions at issue.  At all times, Plaintiffs here and the Eller I plaintiffs had separate

A.      **Dismissal Standard**

The Court accepts as true the factual allegations of the Complaint and draws all

reasonable inferences in Plaintiffs' favor, but does not defer to any legal conclusions or

formulaic recitations of the claims' elements.  <u>Minneapolis Firefighter Relief Ass'n v.</u>

<u>MEMC Electronic Materials, Inc.</u>, 641 F.3d 1023, 1027 (8th Cir. 2011).  Under Rule

12(b)(6), the Complaint "'must contain sufficient factual matter, accepted as true, to 'state

a claim to relief that is plausible on its face.'"  <u>Id.</u> (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S.

662, 678 (2009)).

B.      **Tortious Interference Claim**

Insofar as Plaintiffs' main grievance is that the active players usurped Plaintiffs'

right to negotiate with the League, the Court begins with Plaintiffs' claim for "intentional

interference with prospective economic advantage."  (Doc. No. 1, ¶¶ 138-47.)  Plaintiffs

allege that the "*Eller I* plaintiffs had a reasonable expectation of economic advantage

based on the statements of, and their discussions with, the League."  (<u>Id.</u> ¶ 139.)  They

further allege that by negotiating the rights of NFL retirees, Defendants "interfered with

Plaintiffs' and putative class members' reasonable expectation of economic advantage or

benefit."  (<u>Id.</u> ¶ 144.)  Defendants, however, first contend that no such claim is recognized

by the law of Minnesota.  (Doc. No. 25, at 22-25.)

In <u>United Wild Rice, Inc. v. Nelson,</u> the Supreme Court of Minnesota stated that

---

counsel from those representing the *Brady* plaintiffs.  Moreover, as will be discussed,
even if separate classes of active and retired players would have been certified, the retired
players would still have no viable claims here.

Minnesota recognizes "a cause of action for wrongful interference with both present and

prospective *contractual* relations."  313 N.W.2d 628, 632 (Minn. 1982) (emphasis

added).  In reliance on this particular characterization of the two interference torts, the

Court of Appeals of Minnesota thus has declined "to decide whether a claim for tortious

interference with business expectancy is a valid tort claim under Minnesota law."  Harbor

Broadcasting, Inc. v. Boundary Waters Broadcasters, Inc., 636 N.W.2d 560, 569 n.4

(Minn. App. 2001) (observing that the Minnesota Supreme Court in United Wild Rice

"only recognized the tort of intentional interference with prospective contractual

relations," but leaving "for another day" the issue of "[w]hether this is a distinction

without a difference").[8]

It is beyond dispute that Minnesota recognizes a claim for wrongful interference

with contract, but it is also clear that Plaintiffs' interference claim here does not fit the

parameters of that particular tort because there was no existing contract between the

League and the retired players with which Defendants could have interfered.  With

respect to the other interference tort recognized by Minnesota, it appears that there is

some uncertainty whether such a claim is confined to situations where the plaintiff was

attempting to enter a contractual relationship.  The court in United Wild Rice suggested

as much when it referred to that claim as wrongful interference with "prospective

---

[8]        The Court of Appeals has since relied on its decision in Harbor
Broadcasting to state that Minnesota has not recognized a claim of "intentional
interference with a prospective economic advantage," Pems Co. Int'l v. Temp-Air, Inc.,
2011 WL 69098, *7 (Minn. App. Jan. 11, 2011), or one of "interference with economic
relations," U.S. Fed. Credit Union v. Start & Strikes, LLC, 2011 WL 1466383, *5 (Minn.
App. April 19, 2011).

contractual relations."

But despite the characterization of the torts in United Wild Rice, the court cited two Minnesota decisions as authority for the recognition of those torts–Witte Transportation Co. v. Murphy Motor Freight Lines, Inc., and Wild v. Rarig–without any suggestion that it was modifying the earlier articulations of the parameters of those torts. In Witte, the Supreme Court of Minnesota stated that it "has long recognized that there lies an action for the wrongful interference with *non-contractual* as well as contractual business relationships."  193 N.W.2d 148, 151 (Minn. 1971) (emphasis added) (explaining that most courts have held that "the tort of interference with contractual rights should be extended to include noncontractual business relationships," at least where the "wrongful act of interference" was "intentionally done").  And in Wild, the court stated that "[w]rongful interference with contract and wrongful interference with business relationships, also known as interference with contractual relations and interference with prospective advantage, . . . are actionable tort claims in Minnesota."  234 N.W.2d 775, 790 n.16 (Minn. 1975).  Thus, it appears that Minnesota recognizes a claim for wrongful interference with non-contractual business relationships, that is, a claim of interference with prospective advantage.

But here, even assuming that Minnesota would recognize Plaintiffs' claim for "intentional interference with prospective economic advantage," particularly one that would not include any actual prospective *contractual* relationship, Plaintiffs could not

prevail on that claim as pled in their Complaint.[9]  Even assuming interference here

actually occurred, not every interference with contract or non-contractual business

relations is tortious.  Liability under Section 766B, as with liability under Section 766

(governing intentional interference with the performance of a contract by a third person)

and Section 766A (governing intentional interference with another's performance of his

own contract), is limited to interferences that are both "intentional" and "improper."  E.g.,

Restatement of Torts, § 766B, cmt. d ("The interference, however, must also be

improper."); id. § 767 cmt. a ("In each of [the forms of interference addressed in Sections

766, 766A and 766B], there is a requirement that the interference be both intentional and

improper."); United Wild Rice, 313 N.W.2d at 633 (reversing injunction for plaintiff

where defendant's "interference was not improper").

        The Court will assume, for purposes of this motion, that Defendants' actions in

negotiating the settlement with the League may be deemed "intentional," not because

Defendants "desired" to interfere with Plaintiffs' purported rights, but rather because

Defendants knew that the "interference" was certain or substantially certain to occur as a

result of their conduct in obtaining the settlement and consequent CBA.  Restatement of

_____

        [9]        Plaintiffs argue that "federal courts in this district and lower level state
courts in Minnesota have assumed that the tort exists," and that the Court of Appeals of
Minnesota has "set forth the pleading elements for the tort of interference with a business
expectancy."  In United Wild Rice, the Supreme Court of Minnesota stated that "[t]he
Restatement of Torts sets out the elements of the tort of intentional interference with
prospective contractual relations," and quoted, with apparent approval, the entirety of
Section 766B and Section 768.  Accordingly, this Court will assume Minnesota has
adopted the relevant Restatement provisions in their entirety for purposes of addressing
Plaintiffs' claim.

Torts, § 766B, cmt. d.  In short, the two actions having been consolidated and ordered into mediation, the active players were aware of the fact that the settlement they reached with the League also included new benefits for the retired players.  "Intent alone, however, may not be sufficient to make the interference improper, especially when it is supplied by the actor's knowledge that the interference was a necessary consequence of his conduct rather than by his desire to bring it about."  Id. § 767, cmt. d.

This Court concludes, however, that Defendants could not be held liable for any interference because no reasonable jury could find the purported interference here to be "improper."  The Defendants' motive and the interests they sought to be advanced are two of the relevant factors in making that determination.  Id.; see also id. § 767 (delineating seven factors for determining whether intentional interference "is improper or not").

This is not a case where, for example, the retired players alone were negotiating with the League for additional improved benefits and the active players, not involved in any negotiations with the League, intervened in those negotiations to the detriment of the retired players.  Rather, the active players, having filed their action first, were negotiating their own contract with the League.  In seeking a new contract with the League, Defendants would be under no obligation to, in effect, "harm" themselves in order to avoid "harming" Plaintiffs, by taking a smaller share of the pie for themselves in order to give Plaintiffs a larger share of that pie.  Defendants had the right to pursue the best possible deal for themselves and, if the terms of any particular deal they obtained

necessarily resulted in benefits for Plaintiffs that they now allege are less advantageous to the retired players than what Plaintiffs hoped for or expected, the resulting difference between what Plaintiffs "expected" and what they in fact received cannot be the basis for a tortious interference claim here.  As the Restatement explains, if Defendants "had no desire to effectuate the interference" but "knew that it would be a mere incidental result of conduct [they were] engaging in for another purpose, the interference may be found to be not improper."  Id. § 766B, cmt. d.  Such an economic self-interest of the Defendants is an "important" one and "will normally prevail over a similar interest of" Plaintiffs where, as here, Defendants did "not use wrongful means."  Id. § 767 cmt. f.

Moreover, although there is no dispute that the benefits the retired players seek would constitute an economic advantage or benefit, it is not clear that their purported "reasonable expectation" is, as a matter of law, anything other than the hope of better benefits.  Plaintiffs argue that "[t]he issue here is whether counsel for the *Eller I* plaintiffs could have obtained a better deal in the absence of the alleged interference by Defendants.  It is reasonably probable that a jury could find that the *Eller I* plaintiffs could have done so."  (Doc. No. 51, at 40.)  But the unfortunate fact for Plaintiffs is that they–having retired and thus no longer being able to offer or withhold their services to the League–simply lacked *any* negotiating leverage to obtain new and additional benefits beyond what they already had obtained while still active players.  And this remains so whether or not the NFLPA was a union at the time Defendants would be subject to a duty not to interfere with Plaintiffs' claimed expectation.

14

In other words, Plaintiffs, in negotiating with the League the settlement of their separate action, could not reasonably have expected to enter into a contract based on their own negotiating power as opposed to that of the active players.  Nor could they even have reasonably expected to negotiate some non-contractual "business advantage or expectancy" based on their own antitrust action against the League.  "Some contractual interests receive greater protection than others."  Restatement of Torts § 767, cmt. e. Thus, because Plaintiffs' expectancy here was at best very indefinite–and, in fact, probably nothing more than a hope–Defendants' conduct was not improper.  Id.

Plaintiffs argue that it "is undisputed that the NFL, in negotiating a successor to the 2006-11 CBA, was prepared to give substantially more money to retired players." (Doc. No. 51, at 40.)  Plaintiffs allege that the League had "offered" them $1.5 billion. But there are no allegations, much less plausible allegations, that the League was somehow offering the retired players those benefits, or any benefits, separate and apart from whatever new contract the League was negotiating with the active players. Plaintiffs also rely on the assertion that "[i]n the discussion with Curran, counsel for the plaintiffs in Eller I *proposed* that 2-1/2% of NFL revenues be set aside for the needs of retired players" and that "[t]hat proposal was *not rejected*."  (Id. at 41 (emphases added).) But that proposal was not accepted and thus remains nothing more than a proposal by counsel.

In sum, the Court concludes as a matter of law that Defendants could not have improperly interfered with any reasonable expectation that Plaintiffs possessed of a

prospective economic advantage of obtaining better benefits for the retired players.

### C.     Assumed Fiduciary Duty Claim

Plaintiffs also assert a claim for breach of an assumed fiduciary duty. (Doc. No. 1, ¶¶ 148-53.)[10] They rely on Smith's public comment "that the NFLPA owes a fiduciary duty to retired NFL players." (Id. ¶ 150.) Thus by arrogating "to itself the right and duty to represent the interests of former NFL players in the *Brady* litigation," the NFLPA breached a fiduciary duty to the retired players by sacrificing "the interests and rights of the retirees in favor of active NFL players." (Id. ¶ 152.)

An individual–not otherwise under a duty as a matter of law–may engage in actions by which it assumes a duty to certain parties. E.g. Isler v. Berman, 232 N.W.2d 818, 822 (Minn. 1975) ("It is well established that one who voluntarily assumes a duty must exercise reasonable care or he will be responsible for damages resulting from his failure to do so."). Here, however, Plaintiffs assert the assumption of no ordinary duty, but rather a fiduciary duty. A fiduciary relationship "transcends the ordinary business relationship"–even one involving "a certain degree of trust and a duty of good faith"–and is instead confined to certain contexts such as the duty an attorney owes his client.

---

[10]     This third claim is pled in the alternative to Count I, their claim for declaratory relief. It is not clear, however, why Count III is, or must be, pled in the alternative to a declaratory relief claim. Plaintiffs do not provide, and this Court is unable to discern, how the viability of one claim over the other might turn on any factual finding or legal conclusion. The assumed duty claim could be understood as pled in the alternative to the interference claim, however, insofar as the interference claim assumes, albeit erroneously, that the retired players had their own negotiating leverage, while the assumed duty claim presumes that the active players were negotiating on behalf of not only themselves but also the retired players as well.

Carlson v. Sala Architects, Inc., 732 N.W.2d 324, 330-31 (Minn. App. 2007).  Similarly,

a partner owes his co-partners a fiduciary duty.  Midland Nat'l Bank of Minneapolis v.

Perranoski, 299 N.W.2d 404, 413 n.10 (Minn. 1980).

A fiduciary relationship exists where "'confidence is reposed on one side and there

is resulting superiority on the other.'"  Id. at 413.  But such relationships can not exist

where the party alleging that it is owed such a duty does not place its trust in the other.

Id.  Although Plaintiffs allege that the NFLPA owed them such a duty by virtue of

Smith's statement, Plaintiffs' Complaint is replete with allegations that the relationship

between active and retired players was not one of trust, but one of ongoing discord.  (Doc.

No. 1, ¶¶ 64-79.)  In fact, the assumed duty claim itself includes the allegation that the

NFLPA, whether as an association or as a union, could *not* represent the interests of the

retired players because of "its paramount loyalty and duty to active players," thereby

presenting it with an "inherent conflict of interest between current and former NFL

players in benefit negotiations with the League."  (Id. ¶ 151.)  Some disjunction between

the interests of the active and the retired players appears inevitable in light of the fact that

the players' collective bargaining unit excludes, by definition, the retired players.  (Id. ¶¶

39-40.)  As Plaintiffs themselves allege, "[t]here is an inherent risk that union

representatives bargaining for improved wages will favor active employees at the expense

of the rights of, and benefits due to, retirees."  (Id. ¶ 64.)  Not surprisingly, "the NFLPA

has consistently favored the interests of active NFL players at the expense of NFL

retirees' rights and benefits."  (Id. ¶ 65.)  The law is clear that a fiduciary relationship

does not exist in commercial transactions simply by virtue of a "long acquaintance between the parties or by the plaintiff having faith and confidence in the defendant where the plaintiff should have known the defendant was representing an adverse interest." Hope v. Klabal, 457 F.3d 784, 791 (8th Cir. 2006).

The Court thus concludes as a matter of law that Smith's 2009 statement did not operate to assume any legally enforceable fiduciary duty towards the retired players.[11]  At most, it reflects an interest in obtaining better benefits for retired players as third-parties to any contract entered into between the League and the active players.  And regardless of whatever antagonism might exist between those currently active players and those currently retired, the active players would likely have an interest in obtaining better benefits for retirees not because they have any legal duty towards the present retired players, but because they understand that their own careers will not last forever and, indeed, are often cut short for various reasons.[12]

---

[11]      Granted, the existence of a fiduciary relationship is often a fact question. Toombs v. Daniels, 361 N.W.2d 801, 809 (Minn. 1985).  But here, on these facts, no retired player could reasonably understand Smith's statement to have assumed a fiduciary duty towards the retired players and, likewise, Smith, although an attorney, could not have reasonably intended his statement to have assumed such a fiduciary duty, where he, as the Executive Director of the NFLPA, already bore a duty to the active players that was unavoidably in conflict with the interests of the retired players, at least in the context of federal labor law.  Hope v. Klabal, 457 F.3d 784, 791 (8th Cir. 2006) (affirming summary judgment for defendant where plaintiff "has not raised a genuine issue of material fact as to whether [defendants] were her fiduciaries"); Minn. Timber Producers Ass'n, Inc. v. Amer. Mut. Ins. Co., 766 F.2d 1261, 1268 (8th Cir. 1985) (concluding "as a matter of law that no fiduciary relationship existed between the parties").

[12]      Plaintiffs' reliance on Parrish v. National Football League Players Association–for the proposition that "once the Union decided to take affirmative action on behalf of NFL retirees, it assumed a fiduciary obligation and its acts of bad faith were

And there can be no dispute that a better package of benefits was in fact obtained for the retired players in the 2011 CBA as compared to those in the former CBA.  No jury could reasonably find that the active players did not do better by the retired players in the 2011 CBA.

Moreover, at the time Smith made that statement in April 2009, he was still acting as the Executive Director of the NFLPA.  (Doc. No. 1, ¶ 73.)  As Plaintiffs here well recognize, the NFLPA negotiates with the League on behalf of the active players, and the interests of the active players, if not necessarily antagonistic towards the retired players, are not consistent with that of the retired players insofar as the League offers a single compensation pie to the players, such that any slice allocated to the retired players results in a smaller slice for the active players.  Under these circumstances, the retired players could not reasonably have understood Smith to have undertaken a duty towards them that would be in conflict with his existing duty to the active players.

### D.     Declaratory Relief Claim

Finally, Count I of Plaintiffs' Complaint seeks a plethora of declaratory relief pursuant to 28 U.S.C. § 2201.  The Declaratory Judgment Act–which "provides that a

---

in derogation of that obligation" (Doc. No. 51, at 39)–is misplaced.  <u>Parrish</u> involved only retired players.  2007 WL 3456988, *1 (N.D. Cal. Nov. 14, 2007).  There was no issue of active players, when negotiating with the League for the terms of their own employment, assuming a duty to retired players.  In <u>Parrish</u>, the court found that the plaintiff, a retired player, had alleged a valid claim for breach of a fiduciary relationship based on an agency-by-estoppel theory where the NFLPA solicited retired players to join it, then held itself out to other parties as representing those players for purposes of licensing of their names, images and biographies.  <u>Id.</u> at *8.  Having joined and paid his membership dues, the retired player reasonably expected that the NFLPA would act in good faith on his behalf.  <u>Id.</u>

court 'may declare the rights and other legal relations of any interested party,' . . ., not

that it must do so'–"has long been understood 'to confer on federal courts unique and

substantial discretion in deciding whether to declare the rights of litigants.'"

Medimmune, Inc. v. Genentech, Inc., 549 U.S. 118, 136 (2007) (quoting 28 U.S.C.

2201(a), and Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995) (emphasis added in

Medimmune)).  This discretion exists "even when the suit otherwise satisfies subject

matter jurisdictional prerequisites."  Wilton, 515 U.S. at 282.  Moreover, relief under the

Act is limited to cases presenting an actual controversy between the parties.  28 U.S.C. §

2201(a) (providing that a federal court may issue declaratory relief "[i]n a case of actual

controversy within its jurisdiction").

Here, Plaintiffs request judicial declarations that:  (1) the 2011 CBA did not

release any claims that either they or the Eller I plaintiffs could have asserted; (2) the

putative classes that they wish to represent are not "employees" pursuant to federal labor

law; (3) retirement benefits for former NFL players is not a mandatory subject of

collective bargaining under the NLRA; (4) neither the NFLPA, Smith nor the

Brady Defendants had any right to represent retired NFL players and they had an inherent

conflict of interest in representing the retired players; (5) the right to negotiate the retired

players rights and benefits belonged, from April 4, 2011 to August 22, 2011, to the Eller I

plaintiffs, and since then, to Plaintiffs; and (6) "to the extent the 2011 CBA resolves

issues relating to NFL retirees, those terms be excised from that agreement and be

renegotiated between Plaintiffs and the League."  (Doc. No. 1, ¶¶ 131-36.)

### 1.     First Through Fifth Declarations

With respect to the first five forms of declaratory relief sought by Plaintiffs,

Defendants argue that there is not even any genuine dispute–and thus no justiciable case

or controversy–regarding the declarations Plaintiffs seek.  (Doc. No. 25, at 33-34; Doc.

No. 62, at 19-20.)  The Court agrees.  As Plaintiffs themselves allege, the 2011 CBA

itself provides that it does not release the "claims of any retired player."  (Doc. No. 1, ¶

123.)  And it has been a settled proposition of federal labor law for over 40 years that the

term "employee" does not include those who have retired.  Allied Chem. & Alkali

Workers of America v. Pittsburgh Plate Glass Co., 404 U.S. 157, 166-67 (1971).

Therefore, benefits for retired players are not a mandatory subject of collective

bargaining.  Id. at 1181-82 & n.20.[13]  With respect to Plaintiffs' request for declarations

that (1) neither the NFLPA, Smith nor the *Brady* Defendants "had any right to represent

retired NFL players and were disqualified from doing so because of the inherent conflict

of interest between such retirees and active NFL players," and (2) that right had belonged

to the *Eller I* plaintiffs and now belongs to Plaintiffs, the Court agrees that Defendants

had no legal obligation to negotiate any benefits for the retired players.  And, of course,

the fact that Defendants did negotiate for, and obtain, substantial benefits for the retired

---

[13]     Plaintiffs argue that their declaratory relief claim "flows directly from the" Court's ruling in Pittsburgh Plate Glass.  (Doc. No. 51, at 42.)  But the fact that retired players are not part of the CBU and that benefits for retired employees are not a *mandatory* subject of collective bargaining does not mean either that (1) the active players may *not* negotiate for retired players' benefits as a permissive subject of bargaining, or (2) the retired players are entitled to their own CBU or to retirement benefits at all, such that their purported "rights" were usurped by the active players.

21

players cannot be deemed to create a genuine dispute as to the parties' rights so as to

merit this Court's exercise of jurisdiction over this claim for declaratory relief.

### 2.      Sixth Declaration

With respect to the sixth and last form of relief Plaintiffs seek under Count I,

Defendants argue that Count I, while denominated as one for declaratory relief, in fact

seeks "injunctive relief in the form of contract reformation," but that Plaintiffs "have not

pled the legal elements of," or any facts supporting, a claim for injunctive relief.  (Doc.

No. 25, at 32.)  Defendants further contend that injunctive relief here is, as a matter of

law, unavailable because "monetary injury is the only kind Plaintiffs could allege."  (Id.)

Plaintiffs argue that they are not seeking an injunction and that this Court "must address

the Complaints by considering what Plaintiffs have actually alleged, not Defendants'

recasting or misinterpretation of those allegations."  (Doc. No. 51, at 45.)

The Complaint, by its express terms, seeks a "declaration" that "to the extent the

2011 CBA resolves issues relating to NFL retirees, those terms be excised from that

agreement and be renegotiated between Plaintiffs and the League."  Because that request

seeks a revision of that agreement, not a judicial declaration of what the parties' rights are

under the law or their agreements, it is not an appropriate claim under the Declaratory

Judgment Act.  And insofar as awarding such relief would compel the League to

renegotiate those terms with Plaintiffs, the request presumably seeks injunctive relief.

Nevertheless, Plaintiffs now contend that they "are not challenging the CBA."

(Doc. No. 51, at 45.)  They assert that they do not seek to reject the benefits that

Defendants in fact obtained for them, but rather only to obtain additional benefits.  (Id.

("They are not saying that the $900 million in retiree benefits contained in [the CBA] is

not a starting point for the fair treatment of NFL retirees.  They are instead saying that,

but for the improper conduct of the Defendants, more could have been obtained.")  But

even seeking to add onto what the League agreed to with the players is in some sense a

challenge to the CBA, namely the challenge that those existing terms are inadequate.

Whatever outcome Plaintiffs seek with respect to benefits from the League, this Court is

in no position to declare the parties' respective rights in terms of the adequacy of what the

active players obtained on behalf of the retired players, and if inadequate, to declare what

additional benefits Plaintiffs would be entitled to as a matter of law.  As discussed above,

such outcomes are a function of the negotiations between the League and the active

players, and the unfortunate reality for the retired players is that those parties had no legal

duty to achieve any particular result for the benefit of the retired players.

      Defendants also argue that "Plaintiffs lack standing to challenge the terms of the

CBA to which they are not a party.  Even third party beneficiaries to a contract have no

standing to seek to excise or revise a contract's terms; rather, they may merely seek to

enforce the contract."  (Doc. 25 at 31 (emphasis in original).)  "Here, however, Plaintiffs

neither allege that they are third party beneficiaries nor that the CBA terms affecting

former player benefits are not being enforced."  (Id.)  The Court agrees.  Plaintiffs are, at

most, third-party beneficiaries to the settlement and CBA and thus could only claim that

they are not receiving the benefits that the League promised under those agreements.

That simply is not the case here.

Finally, Defendants assert that Plaintiffs' claim seeking to modify the 2011 CBA must be dismissed for failure to join a necessary party, the NFL, which of course was a party to that contract.  (Doc. No. 25, at 30.)  Plaintiffs argue that a "claim that a defendant interfered with its contract does not render the other contracting party indispensable to the interference lawsuit."  (Doc. No. 51, at 44.)  Where a plaintiff alleges that the defendant is interfering without legal justification with the plaintiff's contract with a third party, the third party–that with which the plaintiff had contracted–is not an indispensable party because "the controversy is between" the plaintiff and the allegedly interfering defendant. Arkansas v. Texas, 346 U.S. 368, 369-70 (1953).  But here, Plaintiffs are not claiming, and could not claim, that Defendants interfered with Plaintiffs' contract with the League because Plaintiffs had no separate contract with the League.  More importantly, however, now that the active players have entered a new settlement contract and CBA with the League, this Court is in no position to reopen those negotiations, much less "excise" any of the terms on which the League finally agreed, without the League's participation as a party to this action.[14]

In sum, the Court concludes that Plaintiffs' requests for declaratory relief are not justiciable under the Declaratory Judgment Act.

### D.    Conversion Of Motion

---

[14]    Plaintiffs request that if this Court would deem the League an indispensable party, then they be granted leave to amend to add the League as a Defendant.  (Doc. No. 51, at 45 n.15.)  But adding the League will not change the fact that Defendants owed no legal duty to Plaintiffs.

Plaintiffs request that this Court convert the Defendants' motion to dismiss under Rule 12 into one for summary judgment and thus to permit discovery. Plaintiffs identify a litany of purported factual disputes that they argue requires such conversion. (Doc. No. 52, ¶¶ 7-15.) Even if the Court were to assume that such factual disputes exist, none of them would be material to the Court's decision that the actual claims that Plaintiffs assert in their Complaints are, as a matter of law, not viable. In arriving at that conclusion, the Court has relied only upon the allegations of the Complaint and matters of public record–largely the earlier proceedings in *Brady* and *Eller I*–of which this Court may take public notice. The Court thus denies the request for conversion.[15]

### E.     Leave To Amend

Finally, Plaintiffs seek leave to amend their Complaints. (Doc. No. 51, at 46.) Granted, "dismissal under Rule 12(b)(6) generally is not immediately final or on the merits because the district court normally will give the plaintiff leave to file an amended complaint to see if the shortcomings of the original document can be corrected." 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357, at 733 (3d ed. 2004). But this rule is based on the "policy of deciding cases on the basis of the substantive rights involved rather than on technicalities," such that the plaintiff should "be given every opportunity to cure a formal defect in the pleading." Id. at 738. The

---

[15]     After the hearing in this matter, Plaintiffs requested permission "to submit evidence to clarify the record" regarding a document on which Plaintiffs relied in support of their argument that the League "and the Brady plaintiffs agreed to the Legacy Fund's terms" in July 2011, before the NFLPA recertified itself as a union. (Doc. Nos. 58, 63.) This document, and Plaintiffs' argument, are irrelevant to this Court's decision that Defendants owed no legal duty to Plaintiffs. The Court thus denies Plaintiffs' request.

defect here, however, is not merely "formal" or "technical."  The problem is that the claims fail as a matter of law.  No amendment of the allegations could render these claims viable here.  Moreover, any other conceivable claims would also be futile in light of the Court's recognition that Plaintiffs simply lacked any negotiating power with the League, and could achieve additional benefits only as third-party beneficiaries to an agreement with the League obtained by the active players.  Finally, Plaintiffs articulate no additional or different allegations or claims that they would make.  In re NVE Corp. Sec. Litig., 527 F.3d 749, 752 (8th Cir. 2008) (affirming dismissal with prejudice where "appellants have not articulated any changes they wish to make, much less demonstrated how revision would address the numerous pleading deficiencies identified by the district court").  The Court thus denies the request for leave to amend.

## III.   CONCLUSION

The Court recognizes and acknowledges the plight of the retired players and is empathetic to their concerns.  Here, however, Defendants simply bore no legal duty to Plaintiffs that could support the claims they presently assert and there is no genuine dispute or other basis on which this Court could properly award the declaratory relief Plaintiffs seek.  Accordingly, the Court need not address Defendants' other arguments, that is, that the state-law claims are preempted by federal labor law and that the Complaints are improperly premised on confidential mediation and settlement negotiations.  Nevertheless, the Court reiterates its deep hesitancy to violate the confidentiality of the mediation and settlement proceedings–a principle articulated at the

outset and one which all parties plainly understood–based simply on one party's

dissatisfaction with the settlement reached by and between the other parties to those

earlier proceedings.

## IV.    ORDER

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.    Defendants' motions to dismiss [Doc. Nos. 23 and 41] are **GRANTED**; and

2.    This action is dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:   May 29, 2012                                    s/Susan Richard Nelson
                                                 SUSAN RICHARD NELSON
                                                 United States District Judge